UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

LARRY W. CALHOUN,            )
                            )
        Plaintiff,          )
                            )    No.  1:05CV00155 CAS/FRB
                            )
v.                          )
                            )
                            )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,  )
                            )
        Defendant.          )


**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**


        This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters were
referred to the undersigned United States Magistrate Judge pursuant
to 28 U.S.C. § 636(b) for appropriate disposition.

I.    **Procedural Background**

        On November 4, 2002, plaintiff applied for Disability
Insurance Benefits ("DIB") and Supplemental Security Income
("SSI"), alleging disability as of February 21, 2002.  (Tr. 132-
34.)  Plaintiff's applications were denied on February 3, 2003.
(Tr. 87-90.) On March 14, 2003, plaintiff filed an application for
a hearing before an Administrative Law Judge ("ALJ").  (Tr. 91.)
The record indicates that plaintiff appeared and testified at a
hearing held on April 26, 2004 before ALJ John C. Tobin (Tr. 58-

72), but the transcript of that hearing is unavailable as will be explained, _infra_. Following this hearing, ALJ Tobin issued his decision denying plaintiff's claims, finding that plaintiff was not under a disability as defined in the Social Security Act. (Tr. 55-62.) On July 29, 2005, the Appeals Council denied plaintiff's request for review. (Tr. 73-75.)

Plaintiff appealed the denial of benefits to this Court on September 20, 2005. (Docket No. 1.) On December 5, 2005, respondent moved this Court to remand the matter to the Commissioner because significant portions of the audio transcript of the hearing were inaudible, rendering the administrative record insufficient for review. (Docket No. 10.) On December 28, 2005, this Court remanded the matter to the Commissioner for further administrative proceedings, pursuant to sentence six of 42 U.S.C. § 405(g). (Docket Nos. 11 and 12.)

On April 26, 2006, plaintiff appeared and testified in a second administrative hearing, held in Cape Girardeau, Missouri, before ALJ Craig Ellis. (Tr. 19-43.) Plaintiff was represented by attorney Donald Rhodes. _Id._ Testimony was offered by vocational expert Gary F. Weimholt, and by Ms. Jo Ellen Avery, plaintiff's girlfriend. (Tr. 33-41.) The medical evidence received and reviewed by the Appeals Council following ALJ Tobin's adverse decision was available to ALJ Ellis at the time of plaintiff's second hearing. On October 19, 2006, ALJ Ellis issued his decision that plaintiff was not under a disability as defined by the Social

Security Act.  (Tr. 6-18.)

The record reflects that, on September 13, 2005, while the instant applications for benefits were pending, plaintiff filed new applications for DIB and SSI payments, which were denied on January 5, 2006.  (Tr. 8, 47-49.)  The record further indicates that, for purposes of administrative efficiency, all of plaintiff's applications were consolidated and resolved by ALJ Ellis' October 19, 2006 decision.  <u>Id.</u>  This decision thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

**II.    Evidence Before the ALJ**

A.    <u>Hearing Testimony</u>

At the hearing on April 26, 2006, plaintiff responded to questions from the ALJ and his attorney.  When the ALJ asked plaintiff how old he was, plaintiff replied "I am not sure."  (Tr. 23.)  The ALJ asked plaintiff his date of birth, and plaintiff replied, "It's on my driver's license, I'll get it for you."  <u>Id.</u> Plaintiff's attorney asked plaintiff regarding his level of education, and plaintiff, again uncertain, replied that he completed the tenth or eleventh grade, and did not remember graduating.[1]  (Tr. 24.)  Plaintiff is right-handed.  (Tr. 33.)

Plaintiff did recall that, while employed as a trash

---

[1]Before the commencement of testimony, plaintiff's attorney indicated that plaintiff's date of birth was October 4, 1959, and that plaintiff had completed the eleventh grade.  (Tr. 22.)  This is consistent with the information plaintiff provided on his applications for benefits, and with the date of birth noted in the medical records.  (Tr. 47-49; 132-34.)

collector, he injured his back in February of 2002 when he lifted a heavy item.[2]  Id.  Plaintiff testified that he subsequently had surgery on his neck, and continued to experience headaches and pain in his head when he turned it too far.  (Tr. 24-25.)  Plaintiff also complained of problems related to his left shoulder, which he attributed to the accident.  (Tr. 25.)  Plaintiff did not undergo shoulder surgery, and indicated that a doctor told him that he may have a pinched nerve.  (Tr. 25-26.)  Plaintiff testified that pain precluded him from lifting his left arm straight up in the air.  (Tr. 26.)

Plaintiff further testified that he suffered from both long and short-term memory loss.  (Tr. 26-27.)  Plaintiff testified that he took Nitroglycerin[3] tablets for "bad chest pains" which occurred intermittently, regardless of his level of activity.  (Tr. 27.)  Plaintiff testified that a doctor had told him that he had a bad "pump," but when asked whether he had been told that surgery was indicated, he testified that he was unable to remember what the doctor told him.  Id.

_____

[2]The record indicates that, on January 21, 2002, while employed by Sonny's Solid Waste Service, Inc., plaintiff suffered a work-related injury and filed a workers' compensation suit, and that, on April 4, 2003, he received a compromise lump sum settlement in the amount of $23,889.00, representing 25% of the body as a whole referable to the neck.  (Tr. 145-48.) The record further indicates that, on August 15, 1997, while employed by Henry Transportation, plaintiff suffered a work-related injury and filed a workers' compensation suit, and that, on February 26, 1998, he received a compromise lump sum settlement of $22,273.60, representing 20% of the body as a whole referable to the low back.  (Tr. 150.)

[3]Nitroglycerin is used to prevent angina, or chest pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601086.html

Plaintiff testified that he suffers from depression which he estimated began "a long time ago." Id. When plaintiff was asked how his depression affected him, he initially replied "I don't know" but, under questioning from his attorney, testified that he disliked being around people, and was in fact uncomfortable in the hearing room because too many people were present. (Tr. 27-28.) Plaintiff further testified that he suffered from approximately three to four crying episodes per week, and that the episodes lasted "I don't know, hours. I don't know, days - -." (Tr. 28.)

Regarding his daily activities, plaintiff testified that he did not "keep track" of the time he rose in the morning or retired at night, and that, during the day, he usually watched television or sat outside watching birds. Id. Plaintiff testified that either his mother or his girlfriend, Ms. Jo Avery, prepared his meals for him. Id. Plaintiff testified that his mother or Ms. Avery also helped him with his housekeeping, and that he lived in an apartment and had no lawn to care for. (Tr. 30.) Plaintiff testified that he disliked shopping because it involved being around too many people. Id.

When asked whether he was currently married, plaintiff replied "Yeah, I think, I ain't sure, I don't know."[4] (Tr. 28.)

_____

[4]In both his initial and subsequent Applications, plaintiff indicated that he was currently married to Cheryl Calhoun, and that they were married on January 1, 1996. (Tr. 47, 132.) In these Applications, plaintiff also indicated the following prior marriages and divorces: married to Wanda Kent on

-5-

Plaintiff testified that he was able to drive, and twice stated that he occasionally borrowed a car from either his mother or Ms. Avery. (Tr. 29.) Plaintiff testified that, on these occasions, he either went for a ride, or drove eight to ten miles to visit his son. Id.

Plaintiff testified that he had problems with his heart when he walked, and was unable to walk all the way around the block, but could "probably" walk down one side. (Tr. 29-30.) Plaintiff testified that, if he walked too far, "[m]y back and stuff spasms up; neck and everything gets to hurting and my doggone heart pounds on me and I have to sit down and take a (Nitro) pill." (Tr. 30) (parenthetical notation added). Plaintiff was unable to squat or bend very well due to probable arthritis in his knees, back, shoulder and neck. Id. Plaintiff testified that he has difficulty using the stairs due to knee pain, and attributed this to injuring his knees while employed as a carpet installer. Id.

Plaintiff testified that, other than visiting his son and his mother, he did not go out to socialize, and did not belong to any organizations. (Tr. 31.) Plaintiff testified that his brother sometimes visited him, and that they occasionally went fishing. (Tr. 31-32.)

---

January 1, 1993 and divorced from her on January 1, 1995; married to Susan Calhoun on January 1, 1985 and divorced from her on January 1, 1986; and married to Jo Ellen Kelley on January 1, 1978 and divorced from her on January 1, 1980. (Tr. 47-48; 132-33.) In his initial Application, plaintiff indicated that he and Cheryl Calhoun were separated, and that her whereabouts were unknown. (Tr. 134.)

Ms. Jo Avery then testified on plaintiff's behalf. (Tr. 33-37.) Ms. Avery testified that she has known plaintiff for 25 years, has been his girlfriend for the past three years, and sees him on a daily basis. (Tr. 33-34, 37.) She testified that she was widowed, and was employed by Blair Packaging. (Tr. 33.) Ms. Avery was asked twice whether she ever allowed plaintiff to borrow her car, and both times she replied that she did not. (Tr. 34.)

Ms. Avery testified that, over the last three to four years, plaintiff had become depressed and withdrawn, and was often irritable and agitated. (Tr. 34-35.) Ms. Avery testified that she observed plaintiff in this condition approximately three times per week. (Tr. 35.) She testified that plaintiff suffered crying spells approximately three times per month. (Tr. 35.) Ms. Avery testified that plaintiff frequently complained of pain in his whole body, particularly his neck, back and ankle. (Tr. 35-36.) She testified that, when she visits plaintiff, he is usually watching television. (Tr. 36.) Ms. Avery initially testified that plaintiff was single, but then testified that she knew he had been married and was uncertain regarding his actual current marital status. Id.

The ALJ then heard testimony from Mr. Gary Weimholt, a vocational expert ("VE"). (Tr. 37-41.) Mr. Weimholt testified that plaintiff's past relevant work included work as a garbage collector, classified as a heavy, unskilled job. (Tr. 38.) Plaintiff also worked as an over-the-road truck driver, a job

-7-

classified as semi-skilled and medium.[5] Id. The ALJ then asked
Mr. Weimholt to assume a hypothetical individual of plaintiff's
age, education and work experience with the ability to:
occasionally lift and carry 20 pounds; frequently lift ten; sit,
stand or walk for six hours each over the course of an eight-hour
day; and occasionally stoop and crouch. (Tr. 39.) The ALJ further
instructed Mr. Weimholt to assume the following limitations: no
overhead work or climbing ropes, ladders or scaffolds; no work at
unprotected heights; no exposure to extreme heat or cold; no more
than occasional interaction with supervisors and co-workers; less-
than-occasional interaction with the public; no fast-paced, high
stress work; and no more than simple work activity. Id. Mr.
Weimholt opined that such an individual would be unable to perform
plaintiff's past relevant work, but would be able to work as a
small parts and small products assembler, which involved bench
assembly work and no involvement with a conveyer. (Tr. 39-40.)
Mr. Weimholt opined that there were approximately 5,000 jobs of
this type in the state economy. (Tr. 40.) Mr. Weimholt also
opined that the individual could work as a hand packager (such as
one who packages check books into small boxes, or packages
pharmaceutical products into small boxes for shipment), of which
there were 4,500 jobs in the state economy. Id. Mr. Weimholt

---

[5]In order to determine whether plaintiff had been an over-the-road truck
driver, the ALJ asked plaintiff to describe the kinds of trucks he drove.
Plaintiff replied "International, Kenworth, Freightliner, Peterbuilt, Morman -
-". (Tr. 38.)

further opined that the hypothetical individual could perform some cleaning occupations such as an evening office cleaner, of which there were 6,000 jobs in the state economy.  Id.

Plaintiff's attorney then cross-examined Mr. Weimholt, and asked him to add depression and occasional crying spells to the hypothetical.  Id.  Mr. Weimholt replied that depression was merely a diagnosis, and that there was no evidence concerning what functional limitations plaintiff had as a result.  (Tr. 40.)  He further testified that there was no indication of the extent and duration of any crying spells.  Id.  The ALJ then asked Mr. Weimholt to assume crying spells of relatively short duration that occurred three times per month.  (Tr. 41.)  Mr. Weimholt responded that such crying spells would not preclude the individual's ability to maintain employment.  Id.

Plaintiff testified that he was not presently receiving treatment from a psychiatrist or psychologist, and that he had not received treatment from a psychiatrist or psychologist before the date of the hearing, but that Medicaid had scheduled him to see a psychiatrist the following day.  (Tr. 42.)  The ALJ granted plaintiff's attorney's request to leave the record open for thirty days to await receipt of the report from that provider.  Id.

B.  Medical Records

The record indicates that, in August of 1997, plaintiff suffered a herniated disc at L5-S1 while lifting a heavy carpet

roll in the course of his truck driving job with Henry Transport. (Tr. 321-54.) Plaintiff was treated by R. Peter Mirkin, M.D., and underwent physical therapy. Id. Conservative treatment failed to yield an improvement, and, on October 9, 1997, Dr. Mirkin performed a micro-decompression and discectomy at L5-S1. (Tr. 353-54.) Dr. Mirkin saw plaintiff in follow-up through February 6, 1998, at which time he released plaintiff to return to work with a 45-pound lifting restriction. (Tr. 334.) On February 17, 1998, Dr. Mirkin opined that plaintiff had a 12% permanent partial disability as a result of this injury. (Tr. 331-32.)

Records from the Cross Trails Medical Center indicate that plaintiff was seen by nurse practitioner Leigh A. Little on November 8, 2000 with complaints of chest pain, gastro-esophageal reflux ("GERD"), situational depression, and erectile dysfunction. (Tr. 527-28.) Plaintiff reported daily consumption of one to two packs of cigarettes, and three to four beers. (Tr. 528.) Nurse Little noted as follows: "I feel like most of his health problems stem from the amount of emotional stress that he is under with life stressors." Id. It is noted that plaintiff had recently suffered the loss of several family members, including a brother who was "allegedly murdered." Id. An EKG was within normal limits, and plaintiff had a normal heart rate. Id. Plaintiff was started on

Wellbutrin[6] and Pepcid.[7] (Tr. 528.) Plaintiff returned to Cross Trails on November 13, 2000 for lab work, and was seen by Nurse Little on November 27, 2000 for follow-up and review of the lab test results, which were normal. (Tr. 525-26.) Nurse Little wrote as follows: "He feels like if we could correct his erectile dysfunction that most of his problems would take care of themselves after that." Id. Plaintiff was given a sample of Viagra.[8] Id.

Plaintiff was seen again at Cross Trails on July 17, 2001 with complaints related to hypertension. (Tr. 195.) Plaintiff returned to Cross Trails for follow-up on September 11, 2001, and it was noted that he had run out of Zestril[9] seven days ago. (Tr. 194.) Plaintiff reported feeling well, and further reported that he continued to smoke one to one and one-half packs of cigarettes per day. Id. Plaintiff denied chest pain, edema, and shortness of breath. Id. The assessment was controlled hypertension, and plaintiff's Zestril prescription was renewed. Id. Plaintiff returned on November 6, 2001 and it was noted that he was "doing well" and tolerating Zestril. (Tr. 193.) Plaintiff again denied

---

[6]Wellbutrin, or Buprorion, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695033.html

[7]Pepcid, or Famotidine, is used to treat gastroesophageal reflux disease, or GERD.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a687011.htm

[8]Viagra, or Sildenafil, is used to treat erectile dysfunction.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699015.html

[9]Zestril, or Lisinopril, is used to treat hypertension.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692051.html

chest pain or shortness of breath. _Id._ Plaintiff reported experiencing depression, anxiety and insomnia due to life stressors, and reported that he was drinking alcohol. _Id._ Plaintiff's objective exam was within normal limits. (Tr. 193.) Plaintiff was started on Zoloft[10], continued on Zestril, and advised to abstain from alcohol. _Id._

The record indicates that plaintiff suffered a work-related injury to his left shoulder on January 21, 2002, while lifting a heavy trash receptacle, and was seen by David A. Pfefferkorn, M.D. (Tr. 369.) Upon exam, Dr. Pfefferkorn noted that plaintiff had pain with any movement above 90 degrees, and opined that plaintiff either had tendonitis or a rotator cuff strain. _Id._ Dr. Pfefferkorn noted that plaintiff wanted to work, and authorized plaintiff to return to work provided he did not use his left hand. _Id._ Dr. Pfefferkorn gave plaintiff samples of Mobic[11] and Ultracet,[12] and instructed him to follow up in one week. _Id._ Plaintiff returned to Dr. Pfefferkorn on January 28, 2002. (Tr. 369.) Dr. Pfefferkorn noted: "Larry says somehow the pain has gone over to his other shoulder which does not make sense at all."

---

[10]Zoloft, or Sertraline, is used to treat depression, anxiety, and other psychological disturbances.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697048.html

[11]Mobic, or Meloxicam, is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis and rheumatoid arthritis.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601242.html

[12]Ultracet, or Tramadol, is used to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html

Id. Plaintiff was able to raise his arm above his head with only minimal pain. Id. Dr. Pfefferkorn did not change his diagnosis of tendonitis of the shoulder, stated plaintiff was improving and continued him on Mobic and Ultracet. Id.

Plaintiff returned to Dr. Pfefferkorn on February 4, 2002 and reported that he had "hurt himself all over" that day while attempting to lift a heavy dumpster. (Tr. 368.) Plaintiff reported that, in addition to his left shoulder, he was now hurting along the left scapula, in the front part of his chest, and also in the right shoulder. Id. Dr. Pfefferkorn noted several tender trigger points without any definite signs of pathology. Id. Dr. Pfefferkorn prescribed light duty work, and plaintiff replied that there was no light duty. Id. Dr. Pfefferkorn continued plaintiff on his medications and instructed him to follow up in one week. (Tr. 368.) Plaintiff returned on February 11, 2002 with complaints of soreness in his left biceps area, dull pain in his right shoulder, and sharp pain in his left shoulder. (Tr. 367.) Dr. Pfefferkorn noted that he could define no specific injury. Id. Dr. Pfefferkorn wrote: "He says that he can still do his work so I am going to let him do this." Id.

On February 25, 2002, plaintiff reported pain while dressing in the morning, and stated that he "loosened up" while at work, but experienced much pain in his neck, shoulders and scapular areas by the end of the day. Id. Dr. Pfefferkorn advised plaintiff to remain off work for one week. (Tr. 367.) On March 4,

2002, plaintiff returned with complaints of pain down his back and neck, and Dr. Pfefferkorn ordered an MRI. (Tr. 366.) On March 8, 2002, it was noted that plaintiff's March 5, 2002 MRI revealed cervical stenosis at several levels. (Tr. 366, 371.) Plaintiff stated that he severely limits his activities due to pain. Id. Dr. Pfefferkorn noted as follows: "The Lorcet causes him to feel somewhat queasy. Of course every medicine that I have given him, has caused him to have some sort of adverse reaction." Id. Dr. Pfefferkorn opined that surgery was not indicated, and recommended physical therapy. (Tr. 366.) Plaintiff saw Dr. Pfefferkorn again on March 22, 2002, and a diagnosis of cervical spondylosis was noted. (Tr. 372.) Plaintiff was apparently referred to a neurosurgeon. Id.

Physical therapy notes from Mid America Rehab indicate that plaintiff received eight physical therapy sessions, concluding on March 21, 2002. (Tr. 379.) It was noted that plaintiff reported no improvement with regard to his neck or shoulder pain, and that he did not progress with his functional status "due to subjective pain complaints and behaviors." (Tr. 381.) It is also noted that therapists were unable to assess plaintiff's range of motion due to guarding and subjective complaints of pain. Id.

The record indicates that plaintiff saw Dr. Mirkin for a consultative examination on June 7, 2002, in conjunction with his workers' compensation case against Sonny's Solid Waste. (Tr. 223–24.) Plaintiff claimed injury to his neck and shoulders on January

21, 2002 when picking up a trash can, and complained of left shoulder pain and pain in his neck radiating down both hands. (Tr. 223.) He indicated that he had been treated with exercises, and that neck surgery had been recommended. Id. Dr. Mirkin's physical exam revealed limited cervical spine range of motion, and tenderness to palpation of the shoulders, but full shoulder range of motion. Id. X-rays of the left shoulder were negative, and x-rays of the cervical spine revealed spondylitic changes. Id. An MRI of the cervical spine revealed spondylitic changes and stenosis at C5-6 and C6-7. (Tr. 223.) Dr. Mirkin assessed cervical stenosis and spondylosis, and recommended anterior cervical decompression and fusion at C5-6 and C6-7. Id. Dr. Mirkin advised plaintiff to stop smoking. Id. Dr. Mirkin further opined that plaintiff could continue working with a 25-pound lifting restriction. (Tr. 224.) On July 11, 2002, Dr. Mirkin performed anterior cervical discectomy with interbody fusion at C6-7. (Tr. 218-20.) A chest x-ray performed at St. Anthony's Medical Center on July 12, 2002 was within normal limits. (Tr. 213.)

Plaintiff saw Dr. Mirkin in follow-up on July 22, 2002. (Tr. 212.) X-rays revealed a consolidating fusion. Id. Dr. Mirkin encouraged plaintiff to exercise and stop smoking, and to return for follow-up in three weeks, at which time Dr. Mirkin anticipated returning plaintiff to "some sort of work activity." Id. Plaintiff returned to Dr. Mirkin on August 14, 2002 with complaints of posterior neck pain. (Tr. 211.) Dr. Mirkin noted

plaintiff's wound had healed, that his neurological, motor and sensory exams were all intact, and that x-rays revealed good positioning of the hardware, and maturing fusion. <u>Id.</u> Dr. Mirkin opined plaintiff could return to a job that did not require him to lift over 20 pounds or engage in any overhead lifting. <u>Id.</u> Plaintiff complained that such a job did not exist, and that he did not wish to return to work. <u>Id.</u> Dr. Mirkin recommended therapy and advised plaintiff to return in six to eight weeks. (Tr. 211.)

Records from Mid America Rehab document plaintiff's physical therapy beginning on August 19, 2002. (Tr. 300-301.) On that date, plaintiff presented with complaints of headache, aching pain in the neck, tinnitus, and pain in his shoulders bilaterally. (Tr. 300.) The therapist noted that plaintiff's signs and symptoms were indicative of recent cervical fusion. (Tr. 301.) On August 27, 2002, plaintiff complained of stiffness and soreness, and stated that therapy was not helping. (Tr. 294.) The therapist noted that plaintiff walked into therapy and did not appear to be in acute distress. <u>Id.</u> On September 3, 2002, plaintiff again reported severe levels of pain with no improvement, and stated that the pain in his shoulders was so bad he could hardly move. (Tr. 290.) The therapist again noted that plaintiff did not appear to be in acute distress. <u>Id.</u> Plaintiff was unable to tolerate light touch or palpation of his neck or shoulders, and could tolerate no palpation or movement of his shoulder. <u>Id.</u> On September 11, 2002, plaintiff again reported no improvement with therapy, and

complained of continuing, severe pain throughout his neck into his shoulders, and a stabbing pain around his left scapula. (Tr. 285.) Plaintiff stated he was barely able to lift ordinary things. <u>Id.</u> The therapist noted that plaintiff bent his head while reading a magazine in the clinic, and that he was able to open his front door and his car door, and indeed drove himself to the clinic. <u>Id.</u> Plaintiff did not tolerate light touch or deep pressure, and the therapist was therefore unable to accurately test him. <u>Id.</u>

On September 13, 2002, plaintiff returned to Dr. Mirkin with continued complaints of persistent pain in his shoulder, but few complaints relative to his neck. (Tr. 210.) Plaintiff's neurological, motor and sensory exams were intact, and repeat x-rays revealed the fusions to be consolidating. <u>Id.</u> Dr. Mirkin opined that plaintiff was doing well relative to his neck, but referred plaintiff for evaluation of his shoulder. <u>Id.</u> Dr. Mirkin opined that plaintiff could work with a 30-pound lifting restriction, and recommended that plaintiff continue aggressive physical therapy. <u>Id.</u>

Plaintiff returned to Cross Trails on September 19, 2002 stating that he had been out of his Zestril for several months, and that he wanted a good check-up while he had insurance. (Tr. 192.) Plaintiff complained of chest pain, and was instructed to return to the center for laboratory tests. <u>Id.</u> Plaintiff also indicated his wish to stop drinking, and that he wanted "something for his nerves." <u>Id.</u> His Zestril was refilled, and he was started on

Librium.[13]  Id.  The record indicates that the laboratory tests, including an EKG, were performed on September 24, 2002.  (Tr. 191.)

On September 23, 2002, plaintiff returned to Mid America Rehab for work conditioning therapy.  (Tr. 281.)  Plaintiff complained that his neck and shoulder pain were currently worse than they were prior to surgery.  Id.  Plaintiff was noted to exhibit muscle guarding, wincing gestures, and withdrawal response.  (Tr. 282.)  It was noted that plaintiff participated in all of his scheduled sessions, and was pleasant and cooperative.  (Tr. 277.)  Plaintiff was noted to have a slow and guarded gait, and to be bracing his left upper extremity.  Id.

On September 26, 2002, physical therapist Craig Brown noted that plaintiff had exhibited no subjective progress with work conditioning therapy due to his subjective pain complaints.  (Tr. 274-78.)  Mr. Brown noted inconsistencies in plaintiff's range of motion and noted that, although objective data revealed some areas of minimal objective improvement, plaintiff exhibited no subjective progress with work conditioning therapy.  (Tr. 276.)  Mr. Brown recommended that plaintiff be discharged from work conditioning due to his lack of progress, but noted that plaintiff was scheduled to see Drs. Mirkin and Lee, and that therapy would continue or cease according to their recommendations.  (Tr. 278.)

_____

[13]Librium, or Chlordiazepoxide is used to relieve anxiety and to control agitation caused by alcohol withdrawal.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682078.html

On September 27, 2002, plaintiff saw Thomas K. Lee, M.D., for evaluation of his left shoulder. (Tr. 209.) Plaintiff gave the history of the January 21, 2002 work-related injury while employed as a garbage collector. Id. Dr. Lee assessed left shoulder adhesive capsulitis, injected the shoulder, and recommended that physical therapy include passive stretching. Id. Dr. Lee instructed plaintiff to follow-up with him in two weeks. Id.

Plaintiff returned to Mid America Rehab for physical therapy on October 2, 2002 with complaints of sharp, stabbing pain and numbness in his left arm, and an inability to move that arm. (Tr. 271.) Plaintiff was tender with light touch in the anterior aspect of the left shoulder, and presented pain behavior uncharacteristic with light palpation. Id. Physical therapist Chuck Dobbs noted that plaintiff was "extremely guarded" with range of motion, and pulled away and jerked when his body was being manipulated, making an accurate assessment difficult. Id. Mr. Dobbs noted that plaintiff was unable to tolerate hand positions, and the therapist was unable to accurately assess joint mobility due to pain and guarding. Id.

On October 9, 2002, plaintiff returned to Dr. Mirkin with complaints of persistent pain in his neck and scapula. (Tr. 208.) Plaintiff's range of motion was 80% of normal, and his deep tendon reflexes, motor exam and sensory exam were intact. Id. Dr. Mirkin saw no sign of pseudo-arthrosis, and noted that x-rays revealed a

well-intact fixation.  Id.  Dr. Mirkin ordered an MRI and opined plaintiff could work with a 40-pound lifting restriction.  Id. Plaintiff also saw Dr. Lee on this date, and complained of pain in his left shoulder. (Tr. 207.) Plaintiff claimed he was no better, but Dr. Lee noted that, objectively, plaintiff demonstrated improvement with active elevation and abduction to 70 degrees.  Id. Dr. Lee re-injected the shoulder.  Id.

On October 23, 2002, plaintiff saw Dr. Mirkin for follow-up. (Tr. 204.) Dr. Mirkin noted that plaintiff's October 16, 2002 cervical spine MRI revealed signs of decompression and fusion, but no significant compression of the spinal cord.  Id.  Dr. Mirkin noted that plaintiff was "rapidly" approaching maximum medical improvement.  Id.  On this same date, plaintiff also saw Dr. Lee, who noted that plaintiff showed inconsistencies, both in the office and during physical therapy, with regard to his shoulder range of motion. (Tr. 203.) Both doctors recommended a functional capacity evaluation. (Tr. 203, 204.)

On November 1, 2002, plaintiff underwent a Functional Capacity Evaluation with physical therapist Craig Brown. (Tr. 382-89.) Mr. Brown noted evidence of symptom magnification, stating that plaintiff's pain levels were not consistent with his observed levels of function, and further that there were inconsistencies regarding bilateral shoulder active range of motion under direct measurement versus under distraction. (Tr. 382.) Mr. Brown indicated that it was questionable whether plaintiff's effort

-20-

during the evaluation could be considered his true level of functioning. <u>Id.</u> Plaintiff reported pain levels of 7/10, which Mr. Brown noted would equate to "bed bound" pain, and would mean plaintiff would require help with some self-care activities. (Tr. 383.) Mr. Brown indicated that, despite his knowledge of this scale, plaintiff reported pain levels in the 7/10 range during the majority of the evaluation. <u>Id.</u>

On November 8, 2002, plaintiff saw Drs. Lee and Mirkin in follow-up. (Tr. 201-02.) Dr. Lee noted that plaintiff showed evidence of symptom magnification, and that he expended some effort but showed multiple inconsistencies between findings in therapy and in the office regarding shoulder range of motion. <u>Id.</u> Dr. Lee assessed left shoulder impingement, and continued plaintiff in physical therapy. <u>Id.</u>

On this same date, Dr. Mirkin noted that the functional capacity evaluation examiner found multiple signs of symptom magnification, and further noted that plaintiff gave incomplete effort. <u>Id.</u> He noted that plaintiff's x-rays revealed a solid fusion, and that plaintiff showed signs of symptom magnification, and that, with effort, plaintiff could function at a higher level. <u>Id.</u> Dr. Mirkin then noted as follows: "He tells me he is unable to get in and out of his truck and I do not particularly buy that." (Tr. 201.) He released plaintiff from his care on this date, noting that he had reached maximum medical improvement. (Tr. 305.) Dr. Mirkin opined that plaintiff could return to work with a 35-

pound lifting restriction.  Id.

On November 27, 2002, plaintiff returned to Dr. Lee with complaints of persistent shoulder pain. (Tr. 200.)  Dr. Lee noted that plaintiff again had a "very odd exam which appears inconsistent with physiological patterns," and much pain with shoulder elevation.  Id.  Dr. Lee shared with plaintiff his opinion that his patterns did not fit the expected findings from a medical condition.  Id.  Dr. Lee continued plaintiff in physical therapy. Id.

Notes from Mid America Rehab indicate that plaintiff consistently attended his physical therapy sessions and consistently reported that his pain levels had not decreased. (Tr. 250.)  On December 11, 2002, physical therapist Christina Voorhees noted that, because of plaintiff's subjective pain complaints and behaviors, he had not progressed with regard to functional status. (Tr. 226.)

On December 23, 2002, Dr. Lee discharged plaintiff from care, with instructions that plaintiff could return to work with lifting restrictions of no more than 15 pounds overhead, and no more than 35 pounds total, as had previously been noted by Dr. Mirkin. (Tr. 304.)

On January 29, 2003, Joan Singer, Ph.D., completed a Psychiatric Review Technique form and concluded that plaintiff exhibited no medically determinable impairment. (Tr. 307-20.)  In so finding, Dr. Singer noted that, despite plaintiff's enrollment

-22-

in special education classes at school, he had a driver's license and had engaged in substantial gainful activity, and was further able to do things such as prepare microwave meals, visit with friends and family, go to the store, manage his money, and complete disability forms. (Tr. 319.)

Also on January 29, 2003, a Physical Residual Functional Capacity Assessment was done by examiner M. Parham. (Tr. 321-29.) It was determined that plaintiff was able to occasionally lift 50 pounds, frequently lift 25, sit, stand and/or walk for six hours in an eight-hour work day; and push and/or pull without limitation. (Tr. 322.) Examiner Parham found no postural, visual, communicative or environmental limitations, and imposed some limitation on plaintiff's ability to reach in directions, including overhead. (Tr. 324-26.) Examiner Parham noted that the severity or duration of plaintiff's symptoms were disproportionate to the expected severity or duration on the basis of plaintiff's medically determinable impairment. (Tr. 327.) The examiner found plaintiff's allegations partially credible. Id. Regarding Dr. Lee's opinion that plaintiff could not lift more than 15 pounds overhead, the examiner noted that this opinion was entitled to little weight due to inconsistencies in the records. (Tr. 328.)

Plaintiff was seen at Cross Trails by Nurse Little on February 10, 2003 with complaints of nocturnal coughing, insomnia, and continued left shoulder pain despite cortisone injections. (Tr. 523.) Plaintiff indicated that he used cigarettes and

alcohol. <u>Id.</u> Nurse Little prescribed cough medicine and ordered spinal x-rays. <u>Id.</u> A thoracic spine x-ray performed on February 12, 2003 was within normal limits, with the exception of some scoliosis. (Tr. 548.) A cervical spine x-ray performed on that same date revealed "no complicating findings," and was within normal limits with the exception of evidence of plaintiff's prior neck surgeries. (Tr. 550.) On February 19, 2003, plaintiff returned to Nurse Little with complaints related to sinusitis. (Tr. 522.) Nurse Little prescribed Keflex,[14] Zyrtec,[15] and Rhinocort.[16] Plaintiff returned on March 19, 2003 with complaints related to high blood pressure, and headaches and hot flashes, and was prescribed Altace.[17] (Tr. 521.) On March 26, 2003, plaintiff saw Nurse Little with complaints of cramping in the arches of his feet, intermittent chest pain over the past two weeks, left arm pain, and a rash on his chest and torso. (Tr. 520.) Plaintiff indicated that he was trying to stop drinking alcohol, and to describe his progress towards this goal, stated that "a 30 pack" used to last him just one day, but now lasted one week. <u>Id.</u> An EKG and an adenosine stress test were scheduled, and plaintiff's

---

[14]Keflex is an antibiotic used to treat bacterial infections. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682733.html

[15]Zyrtec, or Cetirizine, is used to treat the symptoms of seasonal allergies. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698026.html

[16]Rhinocort, or Budesonide, is used to treat symptoms due to allergies. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601030.html

[17]Altace, or Ramipril, is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692027.html

Altace prescription was replaced with Lotrel.[18]  Id.  Plaintiff was given cream for his rash.  Id.

On April 28, 2003, an adenosine stress test was performed at Southeast Missouri Hospital.  (Tr. 455-56.)  The electrocardiogram part of the test was normal.  (Tr. 455.)  The remainder of the test revealed no stress-induced ischemic change, but did reveal a 40% ejection fraction,[19] and it was recommended plaintiff undergo an echocardiogram to better evaluate his ejection fraction results.  (Tr. 456.)  An electrocardiogram was performed on May 5, 2003 at Southeast Missouri Hospital, and  Dr. Spitler interpreted it as revealing normal sinus rhythm, mild global left ventricular dilation and reduced contractility with ejection fraction ranging from 29 to 30 percent, with no specific abnormality to suggest a previous infarct.  (Tr. 453.)  Plaintiff's right ventricle and atrium were normal.  (Tr. 454.)

Records from St. Francis Medical Center indicate that plaintiff underwent septoplasty[20] on May 13, 2003.  (Tr. 398-419.) A pre-operative assessment included radiological studies of the

---

[18]Lotrel, or Benazepril, is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692011.html

[19]The term "ejection fraction" refers to the ratio of the volume of blood the heart empties during systole to the volume of blood in the heart at the end of diastole expressed as a percentage usually between 50 and 80 percent. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=ejection%20fraction

[20]Septoplasty refers to the surgical repair of the nasal septum. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=septoplasty

chest, which showed evidence of plaintiff's prior cervical fusion. (Tr. 411-12.)

Also on May 13, 2003, plaintiff was seen by Allen L. Spitler, M.D., at the Poplar Bluff Medical Clinic. (Tr. 357, 587-88.) Plaintiff complained of chest pain, and his history of controlled hypertension, tobacco usage, and hyperlipidemia were noted.[21] (Tr. 357, 587.) Dr. Spitler noted that plaintiff was taking Toprol XL[22], Lorazepam,[23] Lotrel, and Remeron.[24] <u>Id.</u> Plaintiff gave the history of the January 2002 work-related injury to his neck and shoulder. <u>Id.</u> Dr. Spitler noted as follows: "At this point, in view of recent normal cardiolite, as far as angina and atypical chest pain, I don't recommend angiogram at this point but I have suggested patient stop smoking, stay on his current medications, do not resume alcoholic beverages, and consider an anti-cholesterol medication to keep the LDL below 100." <u>Id.</u> Dr. Spitler's assessment was mild left ventricular systolic dysfunction, possibly related to an old viral illness. (Tr. 357, 587.)

---

[21]Hyperlipidemia is the presence of excess fats, or lipids, in the blood. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=hyperlipidemia

[22]Toprol, or Metoprolol, is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682864.html

[23]Lorazepam is used to treat anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682053.html

[24]Remeron, or Mirtazapine, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697009.html

Plaintiff returned to Cross Trails on May 9, 2003, and saw Nurse Little. (Tr. 519.) She noted plaintiff was still smoking cigarettes and drinking alcohol, and discussed with plaintiff the importance of smoking and drinking cessation. _Id._ Plaintiff indicated his desire to quit, but stated he needed something for his nerves. _Id._ She started plaintiff on Toprol, and noted that David Boardman, D.O., a physician at Cross Trails, approved the use of Ativan.[25] _Id._

Plaintiff saw Nurse Little again on June 4, 2003 with complaints of joint pain for which he was taking Mobic. (Tr. 518.) Plaintiff returned on June 26, 2003 and saw Dr. Boardman with complaints of increased stress, and gave a history of family abuse, alcohol use, unemployment, a feeling of "falling apart," and some thoughts of suicide with no definite plan. (Tr. 517.) Plaintiff's physical exam was normal. _Id._ Dr. Boardman prescribed Zoloft. _Id._ Plaintiff saw Dr. Boardman again on July 14, 2003. (Tr. 516.) Dr. Boardman's impression was anxiety and depression, and plaintiff was given Effexor[26] and BuSpar.[27] _Id._

On July 23, 2003, plaintiff saw Nurse Little and inquired

---

[25]Ativan is used to treat anxiety, and to control agitation sometimes caused by alcohol withdrawal.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682053.html

[26]Effexor, or Venlafaxine, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html

[27]BuSpar, or Buspirone, is used to treat anxiety disorders, or in the short-term treatment of symptoms of anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a688005.html

regarding receiving a laboratory test for bipolar disorder. (Tr. 515.) Plaintiff reported that he had stopped taking Effexor and BuSpar due to stomach upset and dizziness, but said he had experienced dizziness before beginning BuSpar. Id. Nurse Little recommended plaintiff take Zyprexa[28] and consult a psychiatrist, and it is indicated that plaintiff would discuss this with his counselor during an appointment scheduled for the following day. Id. Nurse Little indicated that plaintiff denied suicidal or homicidal intent. Id.

On August 4, 2003, plaintiff saw Dr. Boardman and advised that, although he had recently been drinking one to one and one-half cases of beer daily, he had stopped drinking as of that morning. (Tr. 514.) Plaintiff denied alcohol withdrawal symptoms. Id. Physical exam was normal, plaintiff was given Lorazepam and Mobic for joint pain, and it was noted that he would call if he decided to enter an alcohol rehabilitation program. Id. Plaintiff returned to Dr. Boardman on August 11, 2003 in follow-up for anxiety and joint pain. (Tr. 513.) Plaintiff indicated he had abstained from alcohol since his last visit, and suffered no withdrawal symptoms. Id. It was indicated that his anxiety was "stable," but he complained of persistent left shoulder pain. Id. Plaintiff's physical exam was normal, with the exception of Dr.

---

[28]Zyprexa, or Olanzapine, is used to treat symptoms of schizophrenia and bipolar disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601213.html

Boardman's notation that plaintiff demonstrated severely limited range of motion of the left shoulder "due to pain." (Tr. 513.) Dr. Boardman instructed plaintiff to follow up in two weeks, and noted the potential for an MRI at that time. Id.

Plaintiff returned for follow-up on August 27, and reported continued abstinence from alcohol with no withdrawal symptoms. (Tr. 512.) Dr. Boardman noted that plaintiff's overall mood was more stable. Id. Dr. Boardman noted that, while plaintiff still complained of left shoulder pain, he did not want further evaluation, and refused to submit to an MRI. Id. Plaintiff's physical exam was normal with the exception of limited left shoulder range of motion, and Dr. Boardman recommended that plaintiff take non-steroidal anti-inflammatory medication. Id. On September 3, 2003, plaintiff saw Dr. Boardman with complaints related to an insect bite, and also complained of anxiety and non-exertional chest pain. (Tr. 511.) Plaintiff's physical exam was negative, and Dr. Boardman noted plaintiff's past chemical stress test and ECHO, which had revealed a 30 to 40 percent ejection fraction. Id. Dr. Boardman opined that plaintiff's chest pain was most likely related to anxiety, and instructed him to present to the emergency room if his symptoms worsened. Id.

Plaintiff returned to Cross Trails on September 15, 2003, with complaints of intermittent chest pain and foot cramping, and indicated that his Medicaid was to be discontinued in four days. (Tr. 510.) Nurse Little noted that plaintiff was consuming

-29-

alcohol, and that he was "still having anxiety."  Id.  Plaintiff
was referred to see  Dr. Spitler the following day.  Id.

On September 19, 2003, Dr. Spitler admitted plaintiff to
Southeast Missouri Hospital for angiography.  (Tr. 450-52.)  Dr.
Spitler noted plaintiff's history of chest pain with a normal
stress test. (Tr. 450.)  Plaintiff's cardiac catheterization was
normal with the exception of some degree of dilated
cardiomyopathy.[29]  (Tr. 450-51.)  Dr. Spitler noted that plaintiff
was once again advised to stop smoking and drinking alcohol, and to
continue to control his hypertension.  Id.  Plaintiff returned to
Cross Trails on October 29, 2003 with complaints of headache and
nasal congestion.  (Tr. 508-09.)  Plaintiff was given Toradol.[30]
(Tr. 509.)

On November 26, 2003, plaintiff was admitted to the
psychiatric unit of Southeast Missouri Hospital after presenting
and stating "Nurse practitioner sent me here and I don't know why
I am here." (Tr. 445.)  It was noted that plaintiff was very vague
and evasive.  (Tr. 447.)  Plaintiff did report that he had
experienced a turbulent childhood, and that he currently had mood

_____

[29]The term cardiomyopathy refers to any structural or functional disease
of heart muscle that is marked especially by hypertrophy of cardiac muscle, by
enlargement of the heart, by rigidity and loss of flexibility of the heart
walls, or by narrowing of the ventricles, but is not due to a congenital
developmental defect, to coronary atherosclerosis, to valve dysfunction, or to
hypertension.
www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=cardiomyopathy

[30]Toradol, or Ketorolac, is used on a temporary basis to relieve
moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a693001.html

swings, an uncontrollable temper, depression, and anxiety. (Tr. 447-48.)  Plaintiff stated that, while he had thoughts of suicide via shotgun, drowning, or being hit by a car, he would not act on these thoughts until he obtained insurance to pay for his after-death expenses.  Id.  Plaintiff further reported that his brother had committed suicide.  Id.  Plaintiff stated that he had a twelfth grade education, and that he had had four short marriages.  (Tr. 447.)  It is noted that a complete physical examination, including EKG and ECG, was normal.  (Tr. 445.)  Plaintiff was initially placed on suicide precaution and was started on Seroquel,[31] Remeron, and Ativan.  Id.  The Remeron was discontinued the following day, and plaintiff was given Trazodone[32] and Lexapro.[33]  Id.  Plaintiff was discharged to home on November 27, 2003, having stated that he was feeling better and having denied any suicidal or homicidal thoughts.  (Tr. 445.)  It was noted that plaintiff made good eye contact, had a positive outlook, talked to his family members on the telephone, and was optimistic about the future.  Id.

Plaintiff returned to Cross Trails on January 14, 2004 with complaints of forgetfulness, left leg weakness, and chest

---

[31]Seroquel, or Quetiapine, is used to treat the symptoms of schizophrenia, and episodes of mania or depression in patients with bipolar disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698019.html

[32]Trazodone is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html

[33]Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html

pain. (Tr. 506-07.) It was noted that plaintiff drank a six-pack "every other day." (Tr. 506.) An MRI of plaintiff's brain, performed on January 17, 2004 at St. Francis Medical Center, was negative with the exception of the presence of sinus inflammatory disease. (Tr. 393-94; 540-41.) Nurse Little referred plaintiff to see Dr. David Lee on March 2, 2004. (Tr. 507.)

Plaintiff returned to Cross Trails on January 27, 2004 with complaints of low back pain which began that day while lifting boxes. (Tr. 504-05.) Plaintiff was noted to have discomfort, but full lumbar range of motion was observed on exam. (Tr. 505.) Plaintiff was given Flextra[34] and advised to see Dr. Lee on March 2, 2004. Id.

Plaintiff returned to Cross Trails on March 4, 2004 with continued complaints of back pain. (Tr. 502-03.) He reported that he did not keep his appointment with Dr. Lee. (Tr. 502.) On exam, Nurse Little noted that plaintiff was in no acute distress, and that his back was non-tender with painless range of motion. Id. Plaintiff was seen again on March 10, 2004 with complaints of forgetfulness. (Tr. 500-01.) Nurse Little noted that plaintiff reported consuming alcohol and cigarettes, and her notes indicate that she was concerned whether plaintiff was suffering from dementia. (Tr. 500.) She also questioned whether plaintiff was

---

[34]Flextra is used to relieve mild to moderate aches and pains associated with headache, muscle and joint soreness, backache, colds and flu, sinusitis, toothache, and mild arthritis pain.
http://www.drugs.com/search.php?searchterm=Flextra&is_main_search=1

reliable. (Tr. 501.) She prescribed Ritalin SR[35] and Wellbutrin, instructed plaintiff to follow up in one month, and advised him to stop smoking and drinking. (Tr. 501.) Plaintiff saw Dr. Boardman on April 27, 2004 in follow-up, and "no acute concerns" were noted. (Tr. 498-99.) Physical and "neuro/psych" examinations were normal, and he was advised to follow-up in three months. (Tr. 499.)

The record indicates that plaintiff was admitted to Southeast Missouri Hospital on June 13, 2004, having presented to the emergency room with a history of multiple episodes of sharp, mid-sternal chest pain accompanied by labored breathing and profuse sweating. (Tr. 428-44.) Plaintiff reported symptom onset while climbing a hill during a fishing outing. (Tr. 430, 433, 434.) It was noted that plaintiff was very nonspecific about radiation of symptoms, stating that he had pain everywhere in his body. (Tr. 430.) Plaintiff stated he was taking Lorazepam, Lotrel, Mobic, multivitamins, and Toprol. Id. Plaintiff reported that he was a two pack-per-day smoker for thirty years. Id.

Plaintiff's physical exam was normal, with unremarkable heart tones. (Tr. 431.) An ECG and chest x-ray were both normal. (Tr. 435.) Nancy E. Weber-Bornstein, M.D. noted that she spoke with Dr. Spitler and reviewed a prior angiogram, which was essentially unremarkable other than cardiomyopathy, and essentially ruled out coronary artery disease. Id. Dr. Weber-Bornstein

---

[35]Ritalin SR is used to treat ADD, or Attention Deficit Disorder. http://www.drugs.com/cdi/ritalin-sr-controlled-release-tablets.html

further wrote that, because plaintiff gave "such a great history of exertional chest discomfort" it was best to admit him for observation before discharging him. Id. Dr. Weber-Bornstein's impression was chest pain of unclear etiology, and palpitations, and plaintiff was discharged on June 14, 2004. (Tr. 435, 429.)

Plaintiff returned to Cross Trails on June 17, 2004 with complaints of abdominal pain, and reported his recent hospital visit for chest pain. (Tr. 496-97.) It was noted that plaintiff had abstained from alcohol for several months. (Tr. 496.) Plaintiff was noted to be in no acute distress, and his physical exam was normal. (Tr. 496-97.) Plaintiff was seen in follow-up on July 1, 2004, with complaints of constipation. (Tr. 494-95.) Plaintiff's physical and neuro/psych examinations were normal. Id. Plaintiff was given Naprosyn[36] and Colace.[37] (Tr. 495.) An EKG performed on July 25, 2004 at Southeast Missouri Hospital revealed no cardiac symptoms, normal heart rate and blood pressure changes, and no cardiac arrhythmias. (Tr. 365.) A perfusion study performed on this same date revealed diminished activity in the interior wall which possibly represented diaphragmatic attenuation or a remote infarct. (Tr. 363.)

Plaintiff was seen again in follow-up on August 2, 2004,

---

[36]Naprosyn is used to relieve pain, tenderness, swelling and stiffness associated with different types of arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

[37]Colace is a stool softener used on a temporary basis to relieve constipation. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601113.html

with continued complaints of epigastric pain, reflux and constipation, and additional complaints of anxiety. (Tr. 492-93.) Plaintiff stated that the Naprosyn and Lorazepam were not working, and that he was not taking Wellbutrin. (Tr. 492.) His physical and neuro/psych examinations were normal, with the exception of mild crepitus in his knees. (Tr. 492-93.) Plaintiff was given Lorazepam and Wellbutrin. (Tr. 493.) Plaintiff was seen again at Cross Trails on three occasions (from September 7 through September 22, 2004) for complaints unrelated to his applications. (Tr. 486-91.)

On January 26, 2005, plaintiff saw Dr. Boardman for complaints related to his back, neck and left shoulder. (Tr. 484-85.) Plaintiff's physical and neuro/psych examinations were normal. Id. Plaintiff was diagnosed with back pain, anxiety and hypertension, continued on his current medications, and given Flextra. (Tr. 485.) Plaintiff returned to Dr. Boardman on March 17, 2005, stating he had twisted his back while "getting out of bed." (Tr. 482.) On physical exam, plaintiff was noted to have limited range of motion in all phases of his neck, and decreased range of motion and muscle spasm in his back. Id. The remainder of his examinations were normal. (Tr. 482-83.) He was diagnosed with back strain and was given medication. (Tr. 483.) Plaintiff returned to Cross Trails on April 1, 2005 for follow-up, and reported little improvement. (Tr. 480-81.) Decreased range of motion of the back was noted, and the remainder of plaintiff's

examinations were normal.  <u>Id.</u>  Plaintiff received a Depomedrol[38] injection and was continued on his medication.  (Tr. 481.)

Plaintiff presented to the emergency room of Southeast Missouri Hospital on May 8, 2005 with complaints of right hip pain, stating that the hip locked on him at times.  (Tr. 425-26.) Plaintiff was tender in the lower sacral region on the right, and had pain with rotation of the right hip, and some pain on the left. (Tr. 425.)  Radiological study of the hips was within normal limits.  (Tr. 427.)  The impression was back and hip pain, with possible osteoarthritis of the hips.  (Tr. 426.)  Plaintiff was given Vicodin[39] and Ultracet, and was told that, while surgery was not presently indicated, he may require surgery in the future. (Tr. 425-26.)  An MRI of plaintiff's pelvic bones and hips was performed on May 17, 2005, and revealed mild degenerative changes in both hips, and L4-5 and L5-S1 spondylosis and degenerative disc disease.  (Tr. 421.)

Plaintiff presented to the emergency room of Southeast Missouri Hospital on June 2, 2005 with complaints of leg and back pain, stating that his doctors had indicated they would refer him to a neurosurgeon, but had not yet found one, and plaintiff was hopeful that the emergency room staff could call a neurosurgeon to

---

[38]Depomedrol is a corticosteroid used to relieve inflammation. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601157.html

[39]Vicodin is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

come to the hospital and see him. (Tr. 423.) Plaintiff stated he had low back pain that made it difficult to walk. Id. Physical exam revealed plaintiff to be in no apparent distress, with a normal cardiac rate and rhythm without murmur. Id. There was some decreased sensation in the second and third toes, but the remainder of the foot was normal with no sensation problems and no radiculopathy. Id. Plaintiff stated that he was having trouble being seen by a neurosurgeon because he did not have transportation and was on Medicaid. (Tr. 424.) Plaintiff was given Percocet[40] and was advised to try to pay to see a neurosurgeon and perhaps seek pain management treatment. Id.

On June 7, 2005, plaintiff was seen by Ben Lanpher, Ph.D., a licensed psychologist, to whom plaintiff was referred for a determination of whether he required continued Medicaid benefits. (Tr. 596-98.) When plaintiff was asked to describe the problems he was experiencing, plaintiff replied "I don't know what you mean." (Tr. 596.) Ms. Avery, who was identified repeatedly throughout the report as plaintiff's "ex wife," was present and told Dr. Lanpher that plaintiff had been told that he required hip surgery because he had no cartilage in his hip, and that he had deteriorating discs in his back. Id. Ms. Avery further advised that plaintiff was depressed, and that his short-term memory had progressively

---

[40]Percocet, or Acetaminophen with Oxycodone, is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601007.html

worsened. Id. Dr. Lanpher noted that plaintiff reported that he graduated from high school. (Tr. 597.) Plaintiff described a very traumatic childhood, and reported that his brother had suffered a traumatic death; specifically, that he had been "hung by his girlfriend's son." Id. Plaintiff reported that he spent 90 percent of his day lying in bed, rising only to go to the bathroom or eat chips. Id. Some of his time was spent sitting on the porch watching and listening to birds. Id. Plaintiff reported suicidal thoughts, but no plan or past attempts. (Tr. 597.) Dr. Lanpher noted that plaintiff "moaned and groaned a great deal," complained of pain, and made poor eye contact. Id.

Following examination, Dr. Lanpher noted that plaintiff was functioning within the borderline range of intellectual ability, was disoriented to time, and expressed much pain and agitation throughout the interview. (Tr. 598.) Dr. Lanpher noted that plaintiff appeared to be very depressed, although some malingering may have exaggerated his level of dysfunction. Id. Dr. Lanpher concluded that plaintiff was severely impaired by his psychological condition in his ability to understand and remember instructions, and markedly impaired in his ability to sustain concentration, interact socially, and adapt to his environment. Id.

On June 9, 2005, plaintiff saw Dr. Pfefferkorn with complaints of pain in his back and buttocks, and constant pain going down his right leg. (Tr. 595.) Dr. Pfefferkorn noted that

plaintiff jumped frequently during the examination, stating that he could not stand to sit. Id. Plaintiff then told Dr. Pfefferkorn that he had to sit or lay all day due to back pain. Id. On exam, Dr. Pfefferkorn noted that plaintiff had "somewhat of an hysterical gait, acting like his right leg gives out when he walks," and that he could not test plaintiff's leg strength "because he would not cooperate with examination." Id. Dr. Pfefferkorn's impression was cardiomyopathy of undetermined etiology, and "failed low back surgery syndrome." (Tr. 595.) Dr. Pfefferkorn noted "Because of the cardiomyopathy, I find him to be disabled and his disability to be permanent." Id.

On June 10, 2005, plaintiff saw Dr. Boardman with complaints of back and hip pain exacerbated by activity. (Tr. 478-79.) Range of motion of plaintiff's right hip was noted to be limited due to pain, and plaintiff had limited range of neck motion. (Tr. 478.) An MRI was ordered, and plaintiff was given Ultracet. (Tr. 479.) Plaintiff's June 24, 2005 MRI revealed recurrent right posterolateral disc protrusion at L5-S1. (Tr. 538.)

On June 28, 2005, plaintiff saw Kevin D. Rutz, M.D., of Orthopedic Specialists, with complaints of pain in his low back radiating down the right leg, aggravated by standing and improved with sitting. (Tr. 467-68.) Plaintiff reported taking Vicodin, Ultram (Tramadol), Lorazepam, and Ibuprofen. (Tr. 467.) Plaintiff reported that he did not drink, but smoked one and one-half packs

-39-

of cigarettes per day. Id. Dr. Rutz noted that a June 24, 2005 MRI revealed recurrent lumbar disc herniation. (Tr. 468.) Plaintiff was treated with epidural steroid injection and physical therapy. (Tr. 462-63, 468.)

On July 5, 2005, Dr. Rutz noted that plaintiff reported some improvement after the injection, but was still in pain and was interested in surgical intervention. (Tr. 466.) Dr. Rutz recommended L5-S1 microdiscectomy. Id.

On July 7, 2005, Dr. Boardman reviewed plaintiff's MRI, and noted that he was scheduled for surgery. (Tr. 476-77.) On July 11, 2005, plaintiff saw Dr. Boardman for a pre-operative examination and, with the exception of limited range of motion in his back, plaintiff's examinations were normal. (Tr. 474-75.) Chest x-rays revealed no active cardiopulmonary findings. (Tr. 535.)

On July 25, 2005, plaintiff underwent revision laminectomy and right L5-S1 microdiscectomy with Dr. Rutz. (Tr. 459-61.) Plaintiff followed-up with Dr. Rutz on August 9, 2005, and reported a significant decrease in his leg pain and stated that he was pleased with the results of surgery. (Tr. 465.) Plaintiff stated he was no longer taking pain pills. Id. Dr. Rutz noted plaintiff was "doing quite well" and advised plaintiff to slowly increase his activity level to return to unrestricted activity in four weeks, and follow-up on an as-needed basis. Id.

Plaintiff returned to Dr. Boardman on September 28, 2005

with complaints of exertional chest pain, shortness of breath, and anxiety, and expressed the desire for a repeat angiogram. (Tr. 472-73.) Dr. Boardman noted that plaintiff's September 4th angiogram was interpreted as normal by Dr. Spitler. (Tr. 472.) Plaintiff's physical and neuro/psych examinations were all normal. (Tr. 472-73.) Dr. Boardman refilled plaintiff's medications, and prescribed Trazodone for anxiety. (Tr. 473.) Plaintiff's final visit to Dr. Boardman was on November 4, 2005. (Tr. 470-71.) Plaintiff's hypertension was stable with medication, and his physical and neuro/psych examinations were normal. Id. He was continued on his current medications and advised to follow-up as needed. (Tr. 471.)

On November 5, 2005, plaintiff underwent an independent medical examination with Arthur P. Greenberg, M.D. (Tr. 561-68.) Plaintiff complained of constant left shoulder pain due to a "bone fragment," but Dr. Greenberg noted that plaintiff was unable to provide a coherent history on this problem. (Tr. 561.) Plaintiff also reported chest pain which was relieved by nitroglycerin, and complained of excessive belching with some relief via medication. Id. Dr. Greenberg noted that plaintiff was unable to provide reliable history regarding any of his medical conditions. Id. It is noted that plaintiff was taking a multivitamin, Toprol,

Trazodone, Ranitidine,[41] Flextra, Lotrel, Tramadol, Loratadine,[42] Docusate,[43] Lorazepam, Ibuprofen and Nitroquick (nitroglycerin). (Tr. 562.) Plaintiff reported tobacco use (1.5 packs per day) but denied alcohol use. Id. Plaintiff denied symptoms related to most of the systems of his body. Id.

Dr. Greenberg observed plaintiff to walk unassisted with a normal gait, and to appear stable and comfortable both supine and seated. Id. Dr. Greenberg noted that, throughout the exam, plaintiff displayed below-normal intellectual functioning, a lethargic appearance, a flat affect, poor interaction, and poor memory for medical events. (Tr. 562.) Upon exam, plaintiff was tender to palpation in his cervical and lumbar spine, and he had decreased range of motion in these areas. (Tr. 563-64.) Plaintiff had relative weakness in lower extremity motor strength and a positive supine straight leg raising test which were interpreted as consistent with degenerative changes in the spine. (Tr. 564.) Plaintiff had reduced range of motion in the left shoulder and reduced use of the left arm, pain with strength testing in the left arm, and reduced grip strength consistent with internal derangement

_____

[41]Ranitidine is used to treat ulcers, GERD, and other conditions in which the stomach produces too much acid.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601106.html

[42]Loratadine is used to temporarily relieve the symptoms of hay fever and other allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697038.html

[43]Docusate is a stool softener used on a temporary basis to relieve constipation.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601113.html

in the left shoulder.  Id.

On April 27, 2006, plaintiff was seen by Price Gholson, Psy.D., of The Counseling Center, L.L.C., for an evaluation.  (Tr. 570-81.)  Plaintiff  reported that his mood was "50/50," that he had difficulty falling asleep, and was irritable.  (Tr. 573.)  Dr. Gholson noted that plaintiff cried during the evaluation, and could not respond to further inquiry regarding his depressive symptoms. Id.  Dr. Gholson noted that plaintiff was a "very poor historian," and that he repeated that he could not remember many things and disliked being around others.  Id.  Plaintiff reported that he had a DUI in 2000, but that he presently drank "very little" alcohol. (Tr. 574, 576.)  Dr. Gholson wrote the words "selective memory!" in his examination notes.  (Tr. 574.)  Dr. Gholson noted that plaintiff's attention and concentration were "poor."  (Tr. 579.) Dr. Gholson's diagnosis was major depression, anxiety, and dementia.  (Tr. 577.)  Dr. Gholson checked a box indicating that plaintiff had a disability preventing him from working, and that checked another box indicating an expected duration of twelve or more months.  (Tr. 571.)  Dr. Gholson recommended that plaintiff be approved for continued access to medical care.  (Tr. 579.)

On July 14, 2006, plaintiff was seen by Leeman P. Maxwell, M.D., of CardioVascular Consultants.  (Tr. 583-86.)  Dr. Maxwell noted plaintiff's history of non-exertional "chest pain syndrome," and noted that plaintiff reported being able to walk only one block.  (Tr. 583.)  Dr. Maxwell also noted "there is no

history of unusual alcohol ingestion," and that there was no history of drug use such as methamphetamine or cocaine. Id. Dr. Maxwell noted plaintiff's treatment with Dr. Spitler, with left heart catheterization and selective coronary angiography, which were normal with a "left dominant" system. Id. Plaintiff's physical exam was normal. (Tr. 584.) Plaintiff's echocardiogram findings were consistent with a dilated type of cardiomyopathy, and Dr. Maxwell's impression was idiopathic dilated cardiomyopathy with chronic chest pain syndrome, with findings of normal coronary angiography. Id. Dr. Maxwell wrote as follows: "Patient is New York Heart Association Functional Class II based on history." Id. Dr. Maxwell wrote that plaintiff stated that he was disabled because he did not qualify for a license allowing him to pursue his usual occupation as a truck driver. Id. Dr. Maxwell further found hypertensive heart disease and COPD with ongoing cigarette smoking, and noted that plaintiff was advised of the "extreme importance" of smoking cessation. (Tr. 584.)


III.     The ALJ's Decision

         The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. 11.) The ALJ found that plaintiff had the severe impairments of degenerative disc disease, degenerative joint disease, anxiety disorder, and depression. Id. The ALJ found that plaintiff did

-44-

not have an impairment or combination of impairments that met or medically equaled one listed in the Regulations.  Id.

The ALJ found that plaintiff had the residual functional capacity to lift and carry ten pounds frequently and twenty pounds occasionally; stand and walk six hours each in an eight-hour workday; and occasionally stoop and crouch.  Id.  The ALJ found that plaintiff was limited to simple work activity, with the following specific limitations: No overhead work; no climbing ropes, ladders or scaffolds; no work at unprotected heights; no exposure to extreme temperatures; no more than occasional interaction with supervisors and coworkers; less than occasional interaction with the public; and no fast-paced or high-stress work. (Tr. 11.)

In reaching his decision, the ALJ conducted an exhaustive analysis of the medical evidence of record and concluded that, while plaintiff's medically determinable impairments could reasonably be expected to produce the symptoms he alleged, his statements concerning the intensity, persistence and limiting effects of these symptoms were not credible.  (Tr. 12.)  The ALJ gave great weight to the opinions of Drs. Mirkin and Lee, noting that they were both treating specialists with lengthy relationships with plaintiff.  (Tr. 15.)  The ALJ also gave great weight to the opinion of state agency psychologist Joan Singer, Ph.D., and discredited the opinions of Drs. Lanpher and Gholson.  Id.  The ALJ explained that Dr. Singer's conclusions were based on a review of

-45-

the record as a whole, inasmuch as she reviewed the assessments of Drs. Lanpher and Pfefferkorn, as well as the cardiology, orthopedic and therapy records, while the opinions of Drs. Lanpher and Gholson were based upon "snapshot self-serving reports" from plaintiff. Id. The ALJ discredited the conclusion of Dr. Pfefferkorn (presumably, Dr. Pfefferkorn's statement that plaintiff was permanently disabled due to cardiomyopathy) because Dr. Pfefferkorn never treated or examined plaintiff for a heart condition, and because plaintiff "clearly exaggerated" his problems to Dr. Pfefferkorn. Id.

For his credibility determination, the ALJ cited Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) and Social Security Ruling 96-7p, discussed the relevant factors therefrom, and discredited plaintiff's allegations of impairments precluding all work. (Tr. 13.) The ALJ noted and discussed in detail many inconsistencies between the medical evidence and statements of plaintiff's treating physicians, and plaintiff's own statements concerning his symptoms and limitations. The ALJ concluded that there were so many inconsistencies that it was impossible to ascribe any weight to the many impairments plaintiff alleged. (Tr. 13.) The ALJ further noted plaintiff's sporadic work history, which included erratic earnings (income varying from nearly $25,000.00 in 1995 to $1,400.00 in 1999), and frequent firings and lay-offs. (Tr. 13.) The ALJ further noted that Ms. Avery's testimony supported the conclusion that plaintiff overstated the

extent of his limitations, noting the inconsistency between Ms.
Avery's testimony and plaintiff's regarding the frequency of his
crying spells, and whether or not she ever allowed him to borrow
her car.  Id.  Also noted as incompatible with plaintiff's
testimony were his mother's statements to a state agency worker
that plaintiff visited her daily and did household repairs for her,
and that he regularly went fishing as recently as October 2005.
Id.  The ALJ further noted inconsistencies between plaintiff's
complaints and the medical findings, and the statements from many
treatment providers indicating that plaintiff exaggerated his
symptoms.  (Tr. 13-14.)  The ALJ also noted plaintiff's inability,
during the hearing, to remember his own age, and his comment that
the ALJ could refer to plaintiff's driver's license to determine
his age.  (Tr. 14.)  The ALJ wrote that this demonstrated "the
futility of relying on any allegation by the claimant."  Id.  The
ALJ further noted that similar reports of inability to remember
history were reported when plaintiff was admitted for emotional
problems in November 2003, but "quickly and adeptly" replied to
questions regarding the kinds of trucks he drove.  (Tr. 14-15.)
The ALJ also noted that plaintiff told state agency workers on
October 13, 2005 that he was unable to remember facts regarding his
hospitalizations, but "rattled off phone number immediately" of his
girlfriend.  (Tr. 15.)

       The ALJ concluded that plaintiff was unable to perform
his past relevant work, but was able to perform jobs that existed

-47-

in significant numbers in the national economy. (Tr. 16.) The ALJ found that transferability of job skills was immaterial to the disability determination because using the Medical-Vocational Rules as a framework supported a finding of "no disability" regardless of whether plaintiff had transferable job skills. Id. The ALJ concluded that plaintiff had not been under a disability as that term is defined in the Social Security Act from February 21, 2002 through the date of the decision. (Tr. 17.)

## IV. Discussion

To be eligible for Social Security disability benefits and Supplemental Security Income under the Social Security Act, a plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. It provides disability benefits only to persons who are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). It further specifies that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education,

and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national

economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ;

2.    The plaintiff's vocational factors;

3.    The medical evidence from treating and consulting physicians;

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.    Any corroboration by third parties of the plaintiff's impairments;

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

<u>Stewart v. Secretary of Health & Human Services</u>, 957 F.2d 581, 585-86 (8th Cir. 1992), <u>quoting</u> <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1237 (8th Cir. 1991); <u>see also</u> <u>Briggs</u>, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Briggs</u>, 139 F.3d at 608; <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992), <u>citing</u> <u>Cruse</u>, 867 F.2d at 1184.

In the case at bar, plaintiff argues that the ALJ committed reversible error by applying an improper standard when assessing plaintiff's pain. Plaintiff argues that the ALJ placed little emphasis on the residuals plaintiff suffered, failed to properly weigh plaintiff's subjective complaints, and erroneously required "objective evidence of pain itself." (Brief in Support of Complaint, Docket No. 18, at page 5.) Plaintiff finally contends that the ALJ committed reversible error by failing to assess the combination of plaintiff's impairments, and failed to properly determine the total impact of that combination of impairments upon plaintiff's ability to engage in substantial gainful activity. In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence.

A review of the record reveals that the ALJ properly

determined that plaintiff's impairments were not of listing-level severity, and that his allegations of disabling pain were not credible. "A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment." Polaski, 739 F.2d at 1321. However, testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment. Id.; Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski at 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and set forth the following standard:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

> Id. at 1322.

Although the ALJ may not accept or reject the claimant's

-52-

subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole.  <u>Id.</u>  The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. <u>Gregg v. Barnhart</u>, 354 F.3d 710, 713-14 (8th Cir. 2003).  The foregoing <u>Polaski</u> factors are to be considered in addition to the objective medical evidence of record.  <u>See</u> <u>Baldwin v. Barnhart</u>, 349 F.3d 549, 558 (8th Cir. 2003).  When an ALJ explicitly considers the <u>Polaski</u> factors and discredits a claimant's complaints for a good reason, that decision should be upheld.  <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001).  The credibility of a claimant's subjective testimony is primarily for the ALJ, not this Court, to decide, and this Court considers with deference the ALJ's decision on the subject.  <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005).

In this case, the ALJ cited <u>Polaski</u> and Social Security Ruling 96-7p, and noted his reliance upon the criteria set forth therein.  The ALJ then discredited plaintiff's subjective complaints of disabling symptoms and pain after conducting the proper <u>Polaski</u> analysis.  Specifically, the ALJ wrote:  "The many inconsistencies in the claimant's reports, testimony, and behavior, make it impossible to ascribe any weight to the multitude of alleged impairments he reports. As a result the greatest weight is given to the objective medical findings and other evidence when

considered with the record as a whole." (Tr. 13.)

The ALJ began his Polaski analysis by considering plaintiff's prior work record, noting his history of erratic earnings, and his reports in his Medicaid applications that he had been laid off or fired from a number of jobs. The ALJ noted that this evidence undermined plaintiff's credibility regarding his allegations of disabling symptoms and his overall motivation to work. See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993) (a claimant's credibility is lessened by a poor work history).

In further accordance with Polaski, the ALJ considered the third party statements in the record, and concluded that they failed to corroborate plaintiff's complaints. For example, although plaintiff complained of crying spells that occurred several times per week, Ms. Avery, who saw plaintiff daily, testified that plaintiff's crying spells occurred approximately three times per month. In addition, although plaintiff testified that he borrowed Ms. Avery's car and drove as far as ten miles, Ms. Avery testified that she did not allow plaintiff to borrow or drive her car. Furthermore, although plaintiff claimed that he rarely went fishing due to pain and expense, the record contained evidence that plaintiff's mother told a state agency worker that plaintiff routinely fished with his brother as recently as October 2005. The ALJ also noted that, while plaintiff's mother indicated that plaintiff was unable to remember phone numbers on October 18, 2005,

plaintiff was able to tell State agency workers his girlfriend's phone number on October 13, 2005. (Tr. 15.) Finally, although plaintiff told Dr. Lanpher that he spent 90% of his time in bed, the record contained statements from plaintiff's mother that plaintiff regularly visited her home and did household repairs for her. In addition, the undersigned notes the many instances, as noted in the summary of the medical evidence above, in which plaintiff's physical therapists noted that he appeared to be in no apparent distress, and was able to bend his neck to read a magazine in the waiting room when he presented for physical therapy with severe neck complaints.

The ALJ also noted an abundance of evidence from plaintiff's treating and examining physicians that detracted from plaintiff's complaints of symptoms precluding all work. For example, Drs. Mirkin and Lee repeatedly noted symptom magnification, incomplete effort, multiple inconsistencies between performance during office visits and physical therapy, and subjective complaints that did not correspond to a known medical condition. The ALJ also cited the repeated notations in the physical therapy records that plaintiff's inconsistent efforts thwarted his progress, and that there was evidence of symptom magnification. An ALJ may discount a claimant's allegations if there is evidence that he is a malingerer, or was exaggerating symptoms for financial gain. O'Donnell v. Barnhart, 318 F.3d 811,

818 (8th Cir. 2003).

　　　　In rejecting plaintiff's allegations of disabling chest pain, the ALJ noted that objective testing repeatedly revealed only minor cardiac findings, and that as late as July 2006, no significant abnormality could be found.  "While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003); Cruse, 867 F.2d at 1186 (finding that the "lack of objective medical evidence to support the degree of severity alleged pain is a factor to be considered"); see also Matthews v. Bowen, 879 F.2d 422, 425 (8th Cir. 1989) (medical reports showing only minimal back problem allowed ALJ to discount claimant's subjective complaints of disabling back pain).  Furthermore, plaintiff's cardiac symptoms were apparently related to his alcohol and tobacco use which, especially with regard to smoking, plaintiff continued despite the repeated, insistent advice from various treatment providers that he stop.  Impairments that are controllable or amenable to treatment do not support a finding of disability, and "[f]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits."  Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (citing Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995) (upholding ALJ's finding

of no disability when the claimant's respiratory problems appeared to be related to her smoking habit, and she refused to stop smoking despite medical advice.)

The undersigned does note, however, that the ALJ apparently erroneously interpreted the report of Dr. Maxwell on the subject of whether plaintiff was a "New York Heart Association Functional Class II" (also "Class II"). In his opinion, the ALJ wrote: "Leeman Maxwell, M.D., concluded there was no change indicated in the claimant's treatment. He said the claimant was not New York Heart Association Class II, and did not require more aggressive treatment." (Tr. 12.) In his report, Dr. Maxwell wrote as follows:

> Patient is New York Heart Association Functional Class II based on history.
>
> . . .
>
> The patient was instructed in the extreme importance of cigarette smoking cessation. The patient understands that he represents one who is of significant increased risk for major adverse cardiac events with his continued cigarette smoking. The patient's medical regimen is presently adequate.
>
> . . .
>
> With the patient's QRS being normal, combined with left ventricular ejection fraction greater than 35%, and also combined with functional Class less than Class III, cardiac resynchronization therapy and implantable defibrillator are not indicated.
>
> (Tr. 584.)

The ALJ's apparent mischaracterization of Dr. Maxwell's

impression of plaintiff's functional class level, while apparently erroneous, is harmless error. In the context of judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred. <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 695 (8th Cir. 2003) (applying harmless error analysis; noting standard is "whether the ALJ would have reached the same decision denying benefits" even absent the error). Here, even if the ALJ had correctly interpreted Dr. Maxwell's report as finding plaintiff to be a Class II "based on history", the ALJ would have reached the same decision because Class II indicates only slight, mild limitation of activity,[44] a fact the ALJ noted later in his opinion. (Tr. 15.) Because designation as Class II is consistent with the ALJ's decision, it cannot be said that the ALJ's decision would have been different had the ALJ correctly interpreted Dr. Maxwell's impression of plaintiff's functional class level. The ALJ's apparent error was therefore harmless. <u>See Brueggemann</u>, 348 F.3d at 695.[45]

---

[44]http://www.medilexicon.com/medicaldictionary.php?t=18039

[45]It is also possible that the inclusion of the first "not" in the sentence "He said the claimant was not New York Heart Association Class II, and did not require more aggressive treatment" was merely a typographical error. So finding would be consistent with the context of the ALJ's opinion, inasmuch as Class II indicates only mild restrictions. <u>See Quaite v. Barnhart</u>, 312 F. Supp. 2d 1195, 1199-1200 (E.D. Mo. 2004) (whether misstatement is typographical error is to be determined by reading misstatement in context of entire opinion.) The undersigned further notes that Plaintiff does not make note of or challenge the ALJ's interpretation of Dr. Maxwell's opinion.

Regarding plaintiff's allegedly disabling musculoskeletal pain, the ALJ noted that, while the record documented two discectomies at L5-S1 and a cervical fusion, plaintiff's treating spinal surgeons did not opine that plaintiff was unable to work, but expressly released him to return to work with some lifting restrictions. This is consistent with the evidence of record. As noted, supra, following plaintiff's October 9, 1997 surgery, Dr. Mirkin returned plaintiff to work with a 45-pound lifting restriction. (Tr. 334.) Following plaintiff's July 11, 2002 surgery, Dr. Mirkin returned plaintiff to work with a 35-pound lifting restriction, and Dr. Lee, Dr. Mirkin's partner, agreed and added that plaintiff should not lift more than fifteen pounds overhead. (Tr. 304-05.) Finally, following plaintiff's July 25, 2005 surgery, Dr. Rutz advised plaintiff to return to unrestricted activity in four weeks. (Tr. 465.) As the ALJ correctly noted, the fact that none of plaintiff's spinal surgeons opined that he was unable to perform any type of work supports a finding of no disability, and undermines the credibility of plaintiff's allegations of impairments precluding all work. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (finding lack of significant medical restrictions imposed by treating physicians is inconsistent with complaints of a disabling pain); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (finding fact that reviewing physicians found no disability can be considered by ALJ so long as ALJ conducts independent analysis of medical evidence in

the record).

It must be noted that, in stating that none of plaintiff's treating spinal surgeons restricted plaintiff from working, the ALJ did not overlook Dr. Pfefferkorn's June 5, 2005 statement: "Because of the cardiomyopathy, I find him to be disabled and his disability to be permanent." (Tr. 595.) The ALJ specifically addressed this statement by Dr. Pfefferkorn, and wrote: "As for opinion evidence, the conclusion of Dr. Pfefferkorn is given little weight as he never treated or examined the claimant for a heart condition. The claimant clearly exaggerated his problems to Dr. Pfefferkorn." (Tr. 15.) The ALJ went on to note that he gave controlling weight to the opinions of plaintiff's treating spinal surgeons, inasmuch as they were specialists with lengthy treating relationships with plaintiff. The ALJ's decision to discredit Dr. Pfefferkorn's opinion that plaintiff was disabled was proper.

The Regulations, and Eighth Circuit precedent, provide that a treating physician's opinion is due "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); Hogan, 239 F.3d at 961. The Regulations further provide that a statement by a medical source that a claimant is disabled does not necessarily mean the Commissioner will find the

claimant disabled. 20 C.F.R. § 404.1527(e)(1). A medical source opinion that an applicant is "disabled" or "unable to work" involves an issue reserved for the Commissioner, and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. "[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)).

In this case, it was appropriate for the ALJ to discount Dr. Pfefferkorn's conclusory statement that plaintiff was disabled due to cardiomyopathy. As the ALJ noted, Dr. Pfefferkorn never treated plaintiff for cardiac problems, and it therefore cannot be said that his opinion that plaintiff was disabled due to cardiomyopathy is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(d)(2); Hogan, 239 F.3d at 961. Furthermore, Dr. Pfefferkorn's opinion is inconsistent with the balance of the medical evidence of record. Objective cardiac testing consistently revealed only minor findings, and all of plaintiff's treating spinal surgeons opined that plaintiff could return to work. Finally, Dr. Pfefferkorn's opinion consisted of a simple, conclusory statement that plaintiff was

"disabled". This is not a medical opinion entitled to controlling weight; it is a conclusory statement that attempts to interpret the statute, a task assigned solely to the Commissioner. Stormo, 377 F.3d at 806 (citing Krogmeier, 294 F.3d at 1023.) The ALJ's treatment of Dr. Pfefferkorn's opinion was therefore proper.

Similarly, regarding plaintiff's allegations of disabling depression, the ALJ noted but did not give controlling weight to the opinions expressed by Drs. Lanpher and Gholson, both of whom were consultants who saw plaintiff only once, and opined that plaintiff was severely impaired due to psychological problems. The weight the ALJ assigned to these opinions was proper. The opinion of a consulting physician who examines a claimant only once is generally not entitled to substantial weight. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). Furthermore, the ALJ noted that Dr. Lanpher reported that plaintiff was malingering and exaggerating his symptoms. An ALJ may discount a claimant's allegations if there is evidence that he is a malingerer, or was exaggerating symptoms for financial gain. O'Donnell, 318 F.3d at 818. The ALJ also noted that the opinions were based not upon a review of medical evidence, but merely upon "snapshot self-serving reports" from plaintiff, and were undermined by the sheer volume of other evidence in the record that plaintiff exaggerated his symptoms, purposefully misled his physicians, and demonstrated selective memory. (Tr. 15). A doctor's conclusory statement of disability, without supporting

evidence, does not overcome substantial evidence supporting the Commissioner's decision.  Loving v. Department of Health and Human Services, 16 F.3d 967, 971 (8th Cir. 1994); Browning, 958 F.2d at 823.

As part of his reasoning for discrediting plaintiff's allegations, the ALJ wrote: "The number of times the claimant misled treating or examining physicians in pursuit of a favorable assessment for disability eradicates reliance on any limitation from an impairment that requires manifestation of physical or emotional symptoms reported by the claimant in making the determination." (Tr. 14.)  Factored into this conclusion was plaintiff's reported history of having seen an orthopedic surgeon despite any evidence in the record of plaintiff having seen such a specialist before seeing Dr. Rutz; plaintiff's inability to remember his medical history when seeing Dr. Greenburg for consultative evaluation, despite his ability to give a detailed history to Dr. Maxwell; plaintiff's assertion at the hearing that he could not remember his own age; and plaintiff's inability to remember his job history on State agency forms despite his ability to provide a detailed job history when applying for Medicaid on March 31, 2005.  In sum, the ALJ wrote:

> The greatest consistency throughout the record
> is the claimant's uncooperative attitude and
> allegations of limitations from impairments
> that are grossly disproportionate to any
> clinical signs, laboratory tests, examination
> findings, or imaging studies in the record.
> The claimant's alleged memory impairments are

> contradicted by his adroit and quick responses to the vocational expert and State agency workers as well as his recitation of medical evidence to providers when he has concluded it is in his best interest to provide accurate information."
> (Tr. 16.)

These findings support both the ALJ's treatment of the opinions of Drs. Lanpher and Gholson, and his adverse credibility determination as a whole. Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991) (upholding finding that claimant's reported pain was not credible where claimant's statements to medical professionals were inconsistent).

The ALJ noted that the record reflected only one mental health hospitalization, followed only by treatment for anxiety which was controlled with medication. Conditions that are controllable or amenable to treatment do not sustain finding of total disability. Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1991). The ALJ further noted that Nurse Little diagnosed dementia secondary to alcoholism on January 27, 2004, and scheduled plaintiff to see a mental health specialist, an appointment plaintiff failed to keep. Failure to follow a prescribed course of remedial treatment without good reason is inconsistent with complaints of a disabling condition. Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). In addition, during his next visit to Nurse Little, plaintiff reported no acute concerns, and was not seen again for emotional problems for many months, inconsistent with severe limitations. Id. Indeed, the record lacks evidence that plaintiff ever received regular and

sustained treatment by a psychiatrist or psychologist. A lack of regular and sustained treatment is a basis for discounting complaints, and is an indication that the claimant's impairments are non-severe and not significantly limiting for twelve continuous months. <u>Novotny v. Chater</u>, 72 F.3d 669, 671 (8th Cir. 1995).

However, as noted above, one of the reasons the ALJ gave for discrediting plaintiff was that he was suspiciously forgetful, inasmuch as he often claimed to be unable to remember basic information, but could give detailed information when doing so was in his best interest. One such situation the ALJ cited was that plaintiff was "able to tell Dr. Maxwell that he was a New York Heart Association functional class II." (Tr. 15.) As discussed, <u>supra</u>, Dr. Maxwell wrote that plaintiff was a "New York Heart Association Functional Class II based on history." It is unclear from Dr. Maxwell's note whether plaintiff actually used the term "New York Heart Association Functional Class II" in his discussion with Dr. Maxwell, or whether plaintiff merely described symptoms which Dr. Maxwell interpreted as describing Class II. However, even if the ALJ mischaracterized the history plaintiff gave to Dr. Maxwell as demonstrating knowledge of complex medical terminology, the record reflects numerous inconsistencies, as discussed in sufficient detail by the ALJ, to support the ALJ's credibility determination. This one mischaracterization, if indeed it was a mischaracterization, therefore does not defeat the ALJ's credibility determination.

The ALJ did not, as plaintiff contends, discredit

plaintiff due to a lack of evidence of pain itself; nor did the ALJ fail to properly consider the residuals plaintiff claimed to suffer. On the contrary, a review of the ALJ's decision shows that he acknowledged that plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but reviewed the evidence, cited <u>Polaski</u> and analyzed the appropriate factors, and discredited plaintiff's testimony concerning the intensity, persistence and limiting effects of his symptoms as discussed, <u>supra</u>. The ALJ may disbelieve subjective complaints when there are inconsistencies in the record as a whole. <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ's decision is supported by substantial evidence on the record as a whole, this Court should not substitute its' opinion for that of the ALJ, who is in a better position to assess credibility. <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841 (8th Cir. 1992); <u>Hogan</u>, 239 F.3d at 962.

Finally, plaintiff's contention that the ALJ failed to consider the combined effect of his alleged impairments is not supported by the record. As noted, <u>supra</u>, the ALJ discussed each of plaintiff's impairments individually, and specifically found that plaintiff did not have "an impairment or combination of impairments" that met or medically equaled a listed impairment. (Tr. 11.) Preceding this statement, the ALJ specifically noted his duty to consider plaintiff's impairments individually and in combination, citing the applicable regulations and Social Security Rulings. This

analysis is sufficient.  "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." <u>Browning</u>, 958 F.2d at 821 (citing <u>Gooch v. Secretary of H.H.S.</u>, 833 F.2d 589, 592 (6th Cir. 1987).

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed, and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that they have until March 18, 2008, in which to file written objections to this Report and Recommendation.  Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_____
UNITED STATES MAGISTRATE JUDGE


Dated this 7th day of March, 2008.